IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

**FILED**

JUN 1 8 1998

**LARRY W. PROPES, CLERK
CHARLESTON, SC**

MOORE DRUMS, INC.                        )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )    C.A. No. 2:94-3437-23
                                         )
LOCKHEED CORPORATION d/b/a               )
LOCKHEED AERONAUTICAL SYSTEMS            )          **ORDER**
COMPANY                                  )
                                         )
                    Defendant.           )
_____  )

This matter is before the court upon defendant's motion for
judgment as a matter of law. This matter has been under
advisement for a long time because the court is most reluctant
to upset a jury verdict, however after careful consideration,
the court must nonetheless do so in the present case.

## I. BACKGROUND

This is a *property contamination case wherein Moore Drums,*
Inc., ("Moore Drums") alleges that its property has been
contaminated as a result of acts and omissions of Lockheed
Corporation ("Lockheed"). Moore Drums operates a drum
reconditioning business on its property, which is located in the
Stark Industrial Park in Charleston, South Carolina. Moore
Drums has conducted its business at this location since 1953.
Since 1967, Lockheed has operated an airplane parts
manufacturing plant on property adjacent to Moore Drums. The
Lockheed property site is located to the south of Moore Drums,





so that the southern boundary of Moore Drums is shared with the northern boundary of Lockheed.  Brickyard Creek, which flows into the Ashley River, is located to the west of both Lockheed and Moore Drums.  A drainage way extends east to west along the boundary between the two facilities, except that the drainage way veers north onto and across the Moore Drums property as it approaches the western boundary.

The chemical which Moore Drums claims has contaminated its property is trichloroethylene ("TCE").  As part of Lockheed's manufacturing process, Lockheed operated a "vapor degreaser" that used TCE as a solvent to remove oil from parts prior to the parts being bonded or further processed.  From approximately 1967 until 1987, Lockheed operated three on-site surface impoundments for purposes of treating the TCE-contaminated wastewater that was generated by the manufacturing process. Investigations by consultants hired by Lockheed over the years determined that groundwater in the vicinity of the surface impoundments and other areas was contaminated by various chemicals, including TCE.

After the discovery of contamination on the Lockheed plant property in 1985, the South Carolina Department of Health and Environmental Control ("DHEC") required Lockheed to investigate the extent and nature of the TCE contamination.  The investigation included the installation of numerous groundwater monitoring wells over a period of years.  Unknown to Lockheed at the time the wells were installed, two of the Lockheed wells



2

were actually installed on property owned by Moore Drums. Subsequently, Moore Drums began to suspect that contamination from Lockheed may be contaminating portions of its property. That suspicion was confirmed by Lockheed's own monitoring well data and led to the filing of this lawsuit on December 22, 1994.

The trial of this case began on October 7, 1996 and lasted for nearly two weeks. During the trial, a great deal of expert testimony and documentary evidence was presented to the jury by both sides. In addition, the jury was taken to the site and allowed to view Lockheed's former surface impoundments, Lockheed's wastewater outfall (Outfall 002) into the drainage way, and that portion of Moore Drums' property which was claimed to have been damaged. At trial, Moore Drums introduced evidence that its property is situated such that groundwater from Lockheed flows toward Moore Drums and crosses a portion of Moore Drums' property.

Expert witnesses for both Moore Drums and Lockheed testified that contaminants from Lockheed were transported by the groundwater onto at least a portion of Moore Drums' property. However, the size of the groundwater contamination plume on Moore Drums' property was at issue, and both plaintiff and defendant presented testimony to substantiate each party's contentions. Experts for Moore Drums testified that at least some of the TCE-related contaminants were migrating under the drainage way, thereby affecting a greater portion of Moore Drums' property. In contrast, experts for Lockheed testified



3

that the drainage way extending across a portion of Moore Drums' property acted as a barrier, capturing the contaminants and ultimately discharging them to Brickyard Creek.

The toxicological significance of the TCE-contaminated groundwater was also disputed by the experts. Simply stated, Moore Drums' expert testified that the contaminant levels found in the groundwater beneath Moore Drums' property were toxicologically significant, while Lockheed's experts stated that the levels were insignificant.

Finally, the issue of damages was hotly contested by both parties. In the mind of the court, this is the most significant issue at hand. While Moore Drums contended that the fair market value of its property was significantly affected by Lockheed's contamination, Lockheed contended that there were no damages at all. The testimony on damages offered at trial ranged from zero to $1,900,000.[1]

The disputed issues of fact were submitted to the jury following the close of the evidence. After deliberating for several hours, the jury returned a verdict finding for Moore Drums on the issues of negligence, nuisance, and trespass. The jury awarded $750,000 in actual damages and $750,000 in punitive



---

[1]The $1.9 million figure was testified to by Lockheed's expert Thomas Hartnett, assuming no contamination. Furthermore, it should be noted that Moore Drums' hydro-geologist testified that the cost of cleaning up the Lockheed contamination on Moore Drums' property would be $3,300,000.

4

damages to Moore Drums. Accordingly, a judgment in the amount of $1,500,000 was entered by the court on October 23, 1996.

On November 1, 1996, Lockheed filed its motion for judgment as a matter of law. Lockheed asserts in its motion that there was no showing of negligence, trespass, or nuisance and that Moore Drums failed to prove its damages. Lockheed further asserts that Moore Drums' claims are barred by the statute of limitations; that punitive damages should be stricken; and that the property at issue was not owned by Moore Drums.

## II. STANDARD FOR JUDGMENT AS A MATTER OF LAW

Under Fed. R. Civ. P. 50(b), a party may move for judgment as a matter of law at the close of all of the evidence if that party also moved for a directed verdict at the close of the evidence offered by his opponent. When ruling on a motion for judgment as a matter of law, the trial court must determine whether, taking the record as a whole in the light most favorable to the non-moving party, there is any substantial evidence to support the jury's verdict. Evington v. Forbes, 742 F.2d 834, 835 (4th Cir.1984). Where the non-moving party has the ultimate burden of proof and fails to produce sufficient evidence to support its cause of action, then the court should render judgment in favor of the moving party as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). "A district judge may overturn a jury verdict on a [motion for judgment as a matter of law] only if 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the



5

prevailing] party.'" <u>Anheuser-Busch, Inc. v. L&L Wings, Inc.</u>, 962 F.2d 316, 318 (4th Cir.), <u>cert.</u> <u>denied</u>, 506 U.S. 872 (1992)(citation omitted). In making this determination, the court is not to weigh the evidence or assess the credibility of the witnesses. <u>Hamilton v. 1st Source Bank</u>, 895 F.2d 159, 162 (4th Cir.1990), <u>modified on other grounds</u>, 928 F.2d 86 (en banc). Thus, "[j]udgment as a matter of law is proper when 'without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.'" <u>Singer v. Dungan</u>, 45 F.3d 823, 826 (4th Cir. 1995) (citation omitted).

## III.  LOCKHEED'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Negligence

Lockheed first asserts that the negligence verdict cannot stand because Moore Drums relied solely upon statutory and regulatory violations to establish negligence. Lockheed focuses on jury instructions pertaining to negligence per se based upon violation of the Clean Water Act, the Resource Conservation and Recovery Act ("RCRA"), and the South Carolina Hazardous Waste Management Act.[2]  Lockheed argues that these statutes were erroneously charged to the jury because they create no private

---

[2]Lockheed's motion for judgment as a matter of law also refers to the South Carolina Pollution Control Act as an improper basis for a negligence per se charge. The charge given to the jury, however, specifically stated that the South Carolina Pollution Control Act was not to be considered in deciding whether Lockheed's conduct constituted negligence per se.



6

cause of action and, similarly, a violation of the statutes cannot support a finding of negligence per se. Lockheed further asserts that its contamination most probably occurred in the late 1960's to early 1970's, and that even if the statutes were properly submitted to the jury, they would have been retroactively applied. Finally, Lockheed argues that a finding of negligence cannot be supported by the discharge of contaminants from Outfall 002 because the discharge was authorized by way of a permit issued by DHEC.[3]

The court finds that there was sufficient evidence produced at trial upon which the jury could reach its negligence verdict based on the principles of common law negligence. Viewed in the light most favorable to Moore Drums, the evidence introduced at trial established the following: (1) Lockheed's surface impoundments contained TCE; (2) Lockheed operated the impoundments with failed liners; (3) Lockheed began investigating the environmental impact of its surface impoundments by 1985 and was aware at that time that TCE was

---

[3]Lockheed makes this argument concerning Moore Drums' negligence and trespass claims. However, damages claims conflict with a regulatory agency's permits only if the allegedly tortious activities "(1) were required, directed, or supervised by the [regulatory agency] and (2) were performed properly." Cavallo v. Star Enterprise, 100 F.3d 1150, 1156 (4th Cir. 1996). In the present case, there has been no showing that the damages alleged by Moore Drums arose out of remediation efforts which Lockheed performed within the scope of any DHEC permit. To the contrary, viewed in the light most favorable to Moore Drums, the evidence showed that the alleged injury was suffered as a result of Lockheed's noncompliance with applicable regulatory standards, including any permits issued by DHEC.



harmful; (4) Lockheed's consultants concluded in 1985 that releases of TCE from the impoundments impacted groundwater which flowed in the direction of Moore Drums; (5) Lockheed personnel identified sources of TCE contamination in addition to the surface impoundments; (6) Lockheed became aware as early as 1991 that its groundwater contamination was moving off-site, and did not address the problem until requested by DHEC; (7) Lockheed denied to DHEC as late as 1994 that its contamination was moving off-site; (8) in 1993, Lockheed was aware that wastewater discharged from Outfall 002 consistently contained TCE at levels well over the maximum allowed limit; and (9) in 1994 Lockheed understated the TCE levels at Outfall 002.    Based on the evidence outlined above, the court finds that there was sufficient evidence presented whereby a reasonable jury could find for Moore Drums on the issue of negligence under the traditional negligence standards.

Notwithstanding the fact that a reasonable jury could conclude that Lockheed was negligent under the traditional negligence principles, the court also finds that there was sufficient evidence presented at trial upon which a reasonable jury could base a negligence per se verdict.    Viewed in the light most favorable to Moore Drums, the evidence presented showed that Lockheed discharged wastewater containing TCE from Outfall 002 and that Outfall 002 was operated from 1967 until 1994 without the required environmental permits and/or in violation of statutory requirements.    Wayne Fanning of DHEC's



8

local district office testified that Lockheed violated provisions of the Clean Water Act, RCRA, and the South Carolina Hazardous Waste Management Act by discharging contaminants from Outfall 002 without the required permits. Mr. Fanning also testified that other violations of these statutes resulted from the discharge of contaminants by Lockheed into the groundwater. This evidence provides a sufficient basis upon which a reasonable jury could return a negligence verdict in Moore Drums' favor based on negligence per se.

## B. Trespass

In its motion, Lockheed asserts that the jury's verdict regarding trespass cannot stand because there was no showing of the initial release of TCE, and that the intentional nature of the act cannot be shown with respect to groundwater. In addition, Lockheed repeats its argument that the discharge from Outfall 002 occurred pursuant to a permit and cannot support a finding of trespass.[4]

Viewing the evidence in the light most favorable to Moore Drums, the court finds that the evidence presented indicates that: (1) Lockheed operated its surface impoundments from 1967 until 1987; (2) wastewater placed in the impoundments contained TCE; (3) the impoundments were operated with torn liners; (4) TCE contamination is present in the groundwater in the vicinity of the former surface impoundments; (5) Lockheed was aware of



[4]See n.3 supra.

9

the flow of the groundwater contamination toward Moore Drums' property in the 1980's; and (6) the groundwater has transported TCE contamination onto Moore Drums' property. Moreover, Lockheed's own consultant estimated that at the time of trial approximately 3,800 gallons of contaminated groundwater per day continue to cross the property line from Lockheed to Moore Drums, and two of Lockheed's more contaminated wells, MW-18 and MW-18R, are on Moore Drums' property. The requisite intent for a finding of trespass in South Carolina "is proved by showing that the defendant acted voluntarily and that he knew or should have known the result would follow from his act." Snow v. City of Columbia, 409 S.E.2d 797, 802 (S.C. Ct. App. 1991); see also Shockley v. Hoechst Celanese Corp., 793 F. Supp. 670 (D.S.C. 1992) aff'd in part rev'd in part on other grounds, 996 F.2d 1212 (4th Cir. 1993)("[T]he trespasser, to be liable, need not intend or expect the damaging consequences of his entry. . . .")(citations omitted). From the evidence presented, a reasonable jury could find that Lockheed intended to operate its surface impoundments as it did and it knew or should have known the consequences of operating the impoundments with failed liners. A reasonable jury could further find that Lockheed failed to contain the groundwater contamination to prevent migration onto Moore Drums' property. Moreover, a reasonable jury could find that Lockheed knew or should have known the consequences of discharging TCE contaminants from Outfall 002 as a result of its manufacturing process. Therefore, despite the



10

existence of a permit beginning in 1994, a jury could have reasonably concluded that Lockheed's discharge of TCE from the outfall constituted a trespass.

## C. Nuisance

Lockheed contends that the nuisance verdict cannot stand because there was no testimony that the areas affected prevented use or enjoyment of the facility in an unreasonable way. Lockheed states that the area is part of a drainage easement dedicated to the public.[5] However, Moore Drums' toxicology expert testified that Lockheed contamination on property actually owned by Moore Drums rose well above the level of toxicological concern. Testimony was also presented by Moore Drums' president that the company paid $80,000 for the design of a groundwater recovery system to address low levels of petroleum contamination present where Moore Drums formerly operated two surface impoundments. Once it was discovered that Lockheed's contamination had migrated to Moore Drums' property, the recovery system could not be used because it might draw even more Lockheed contamination across the property line and at a

---

[5]With regard to nuisance, Lockheed also argues that Moore Drums came to the nuisance because it brought an action to quiet title against the State of South Carolina to clarify its ownership of the contaminated portion of its property. The court dealt with this issue at a hearing during which Lockheed and Moore Drums presented expert witness testimony and other evidence. Pursuant to the hearing, the court ruled that Moore Drums has title to the property on several grounds, including a chain of title extending back to a 1674 King's grant. The order resolving this issue was entered on October 7, 1996, and is incorporated herein by reference. The court will not revisit its decision.



11

faster rate. Viewing this evidence in the light most favorable
to Moore Drums, a reasonable jury could have found that
Lockheed's contamination interfered with Moore Drums' use and
enjoyment of its property.

## D.  Statute of Limitations

Lockheed further argues in its motion that Moore Drums knew
as early as 1990 that Lockheed's contamination had an impact
upon its property and the action is barred by South Carolina's
three-year statute of limitations.    At trial, however, the
president of Moore Drums testified that the company did not
learn of the presence of Lockheed's contamination on Moore
Drums' property until it received an April 20, 1994 data report
showing the presence of Lockheed's contaminates in a groundwater
monitoring well that Moore Drums recently installed.    Moore
Drums' president further testified that, upon receiving the data
report, he met with Lockheed representatives to discuss the
contamination issue.   During this meeting, Lockheed denied that
any of its contamination was off-site.    Moreover, by letter
dated  June  8,  1994,  DHEC  notified  Lockheed  that  its
contamination may have migrated onto Moore Drums property. In a
written response to DHEC dated June 30, 1994, Lockheed stated in
part that "it is aware of no convincing evidence of off-site
contamination resulting from releases from closed surface
impoundments at LASC [Lockheed] Charleston.  Nothing in reports
prepared by LASC under the requirements of Hazardous Waste



Permit Number SCD 048 273 023 confirms any such contamination."
Viewing this information in the light most favorable to Moore
Drums, the company did not know of Lockheed contamination on
Moore Drums' property until after it received the April 20, 1994
data report.  The action was therefore not barred by the three-
year statute of limitations.

### E.  Damages

As in many cases involving environmental contamination, the
damages issue in this case is problematic. Lockheed contends
that Moore Drums failed to submit legally sufficient proof of
damages under any of its causes of action.  Lockheed reasons
that the testimony regarding diminution in value offered through
Moore Drums' real estate expert, Charles F. Middleton, failed to
establish diminution in value on either a permanent or temporary
basis.  Specifically, Lockheed argues that Moore Drums' expert
did not appraise the property on the basis of it being
contaminated, and therefore, there was no evidence regarding
whether there would be any diminution in value of Moore Drums'
property after the cleanup of Lockheed's contamination was
effected.    Lockheed acknowledges that it is obligated to
remediate its contamination to the satisfaction of DHEC which
relieves Moore Drums of any responsibility for costs associated
with cleaning up the contamination.



A "trial judge must ensure that any and all [expert]
testimony or evidence admitted is not only relevant, but

13

reliable." <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993). Moreover, the Federal Rules of Evidence require a judge to undertake an assessment of whether the reasoning or methodology underlying the expert's testimony is valid and whether that reasoning or methodology can be properly applied to the facts in issue. <u>Frymire-Brinati v. KPMG Peat Marwick</u>, 2 F.3d 183, 186-87 (7th Cir. 1993)(citing <u>Daubert</u>, 113 S. Ct. at 2790).

Under South Carolina law, "[t]he measure of damages for permanent injury to real estate by pollution, whether by nuisance, trespass, negligence, or inverse condemnation is the diminution in the market value of the property." <u>Ravan v. Greenville County</u>, 434 S.E.2d 296, 307 (S.C. Ct. App. 1993)(citing <u>Gray v. Southern Facilities, Inc.</u>, 183 S.E.2d 438, 442 (S.C. 1971)). Plaintiff's proof of market value diminution was undertaken through the use of two witnesses, Jack Moore, Jr., a lay witness, and Mr. Middleton. At trial, the court sustained objections to Mr. Moore's opinion of market value diminution due to contamination.[6] While a property owner may

---

[6]While the court allowed Mr. Moore to give his opinion of the value of Moore Drums' property as $2.0 million, the court sustained an objection to his opinion as to the effect of contamination on the property. Tr. p. 639-40. Moore offered no possible basis for such an opinion, i.e. he had not tried to market the property, he had no experience in dealing with contaminated property, and he had not had it appraised in its contaminated state. Thus, he did not have the usual knowledge imputed to an owner about the value of his property in its contaminated state. The court has found no South Carolina cases on point. In a different context the South Carolina Supreme Court ruled that although many plaintiffs asserted in answers to interrogatories and depositions that a neighboring plant had



14

normally be permitted to testify about the fair market value of property, in the present case, expert testimony is required to determine what effects, if any, contamination has upon the market value of the property. Expert testimony is especially needed when, as here, the contaminating party is required to remediate the contamination of the subject property in accordance with a permit issued by DHEC.

Plaintiff's approach to damages in this case is appealing in its simplicity. Plaintiff had Middleton, a MAI, and acknowledged expert in the appraisal of real estate, perform a full real estate appraisal on the Moore Drums' property in its pristine condition, i.e., assuming that it had not been contaminated. That would, of course, establish the bench mark against which diminution in value would be measured once the value of the property was ascertained in its contaminated condition. But rather than performing a full appraisal of the property in its actual or contaminated condition, Middleton instead took the position that the property was worthless because lenders would not readily make loans for the purchase of the property. The only testimony he offered to bolster that

caused a diminution in the value of their property, such "bald allegations" are insufficient to create a genuine issue of fact. Baughmain v. AT&T Co., 410 S.E.2d 537, 546 (S.C. 1991).

Maryland, which like South Carolina has a long-standing rule that an owner of property can testify as to its value, recognizes that in some circumstances expert appraisal testimony would be required to determine fair market value. Lakewood Engineering & Manufacturing Co., Inc. v. Quinn, 604 A.2d 535, 543 (Md. Ct. Spec. App. 1992). While the facts are not similar, the principle is sound.



15

opinion was a small telephone survey limited in scope, limited in depth, and limited in time. Middleton did not keep any notes as to what information he provided the bankers. Tr. p. 551, lines 2-5. He did not tell them the property was the Moore Drums property. Tr. p. 551, lines 11-12. He did not give them the constituents of concern that contaminated the property. Tr. p. 551, lines 17-18. He did not tell them that Lockheed had a DHEC approved permit, and acknowledged responsibility to remediate the property. Tr. P. 551, lines 19-23. He did not differentiate between the Moore contamination and the Lockheed contamination and only told the bankers that there were two forms of contamination on the property, one more severe than the other. Tr. p. 552, lines 19-23. He did not tell them the estimated cost of cleaning up the Moore property. Tr. p. 552, line 25 through p. 553, line 2. Most of the conversations with bankers took less than five minutes, and some did not take three minutes. Tr. p. 569, lines 9-13. Most of the lenders he spoke with were not interested in property that was contaminated at all from any source. Others would have to examine the property on a case by case basis and make a risk assessment which included Moore Drums' contamination of its own property.

> Q: Basically what they told you, if Mr. Moore's got contamination on his property from his own operation, we won't make a loan?



> A: Right, that they would not be interested.

Tr. p. 566, lines 15-18.

16

As to what market existed for contaminated properties, Middleton was uninformed and made little effort to find out whether there was a market for this particular property.

Q: From your notes can you point to a single lender that told you they would loan on this property if it has contamination on it from Moore company's own operations?

A: I cannot point to a single lender, but the interesting thing was, is that, you know, compared to eight or ten years ago when they just absolutely would not even discuss it, now they will go in, they will look at it, they will do their own risk assessment, and it is my understanding that there are lenders in the country who will, you know, on occasion, all facts known, perhaps make loans on contaminated properties.

Q: But you can't name one of those?

A: Well, they told me that they did.

Q: But none of them said they would in this case based on the Moore Drums originated contamination on the same property?

A: Because they don't know the extent or anything. I was just trying to find out, you know, is there a possible market for a loan.

Tr. p. 569, line 20 through p. 570, line 12.

That is hardly the basis upon which any court would allow an expert in real estate appraisal to form an opinion as to value. Nonetheless, Middleton was willing to opine that the property was worthless based upon those conversations. Plaintiff's problems with damages do not end there. In order to be consistent, Middleton conceded on cross-examination that if Moore could not get a loan on his property due to contamination by his own company (as his phone survey indicated) then he would be unable to convey the property, and therefore, it would not



17

have market value. Tr. p. 571, line 17 through p. 572, line 1. Thus, even if Middleton's opinion were admissible, it offers the jury no basis upon which to differentiate between Moore Drums' contamination of its property and Lockheed's contamination of the property so far as its market value is concerned.

There was much discussion about whether the property had value independent of market value. It is obvious that the property has value, and it could be argued from Middleton's full appraisal of the pristine property, that the most appropriate indication of market value would be from the income approach, which in Middleton's appraisal values the property at $1.7 million. Using the rental value of the property, it is worth approximately $2.0 million. Tr. p. 572, lines 2-20 and Tr. p. 526, line 2 through p. 528, line 21.

Plaintiff further takes the position that all of this is irrelevant because its expert estimated the cost of clean-up at $3.3 million. That position ignores the fact that the defendant is the one responsible for the clean-up, and Middleton agreed that once the property was remediated it would have the same



18

fair market value as it otherwise would have had.[7] Tr. p. 561, lines 9-17.

At trial, defendant moved to strike Middleton's testimony regarding the effect of the contamination upon the fair market value of the property. At that time the court expressed skepticism about whether Middleton's testimony was sufficient to sustain a verdict in favor of Moore Drums. Based upon the discussion above, the court finds that the testimony should have been stricken because it had little or no probative value in establishing plaintiff's damages and fails to comply with the established rules regarding expert testimony.[8]

Here are the problems with Middleton's approach. First, Middleton abandoned the methodology of the professional appraiser, i.e., the three approaches to value, and he replaced it with a telephone survey of bank and savings and loan officers as to their lending practices. This is not the type of information that a MAI appraiser would ordinarily base his

---

[7]Middleton later retreated from this position to say that he did not know whether there would be any impairment of fair market value after cleanup. Tr. p. 563, line 3 through p. 564, line 1. Of course, he could not say as to either Moore's contamination or Lockheed's contamination of the property. Plaintiff further contends that its experts have determined that the property will never be cleaned up. This, however, is a matter left to the judgment of the regulatory authorities at EPA and DHEC.

$\frac{19}{\text{JMP}}$

[8]"The credibility of competing experts is a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor." Alevromagiros v. Hechinger Co., 993 F.2d 417, 421 (4th Cir. 1993) (citation omitted).

19

opinion upon in appraising the value of real estate.  Second, Middleton, acknowledging that there was a market for contaminated properties, conceded that he had no special expertise in valuing contaminated properties which was not fatal to his rendering an opinion, but he further conceded that he did not appraise the property in its contaminated state which is fatal to his ability to render an opinion as to its value.

Third, even if his bank survey were accepted as an appropriate basis for rendering an expert opinion, Middleton acknowledged that the vast majority of bankers to whom he spoke said that they would not loan money on any contaminated property.  This completely undermines plaintiff's approach to damages because it is uncontroverted that the plaintiff contaminated the property itself.

Fourth, Middleton's approach ignores the fact that Moore Drums has continued to operate its business uninterrupted on the property, indicating that the property has value, which is consistent with Middleton's full appraisal of the property where the income stream analysis indicated that the property would be worth $1,730,000.  Tr. p. 529, lines 3-5.

Lastly and very importantly, the plaintiff's approach ignores the fact that the defendant has acknowledged the responsibility for clean-up of the property and is presently working on-site under DHEC permits from the State of South Carolina.



20

The court will now address these problems. At the outset
it should be emphasized that the court is mindful of the
difference between market value and use value, both in real
estate appraisal and in the legal context of damages. The real
estate appraiser's job is to give an opinion as to value, and it
is the custom of the appraiser to use three (3) approaches to
value, those being the cost approach, the income approach, and
the market comparison. This is the methodology of the members
of the appraisal institute (MAI). Tr. p. 515-516. That is the
embodiment of the expertise that renders one qualified to tender
an opinion in court. Using proper methodology and assuming no
contamination on-site, plaintiff's expert valued the property at
$1.8 million. Tr. p. 519.[9]

Fed. R. Evid. 702 provides that if scientific, technical,
or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience,
training, or education may testify thereto in the form of an
opinion or otherwise. The first major requirement of Rule 702
is that the witness proffered to testify to specialized

---

[9]Middleton adjusted this figure by deducting $200,000 as the
"cost to cure" the on-site problem caused by Moore Drums'
contamination of its own property. In so doing, he obviously
did not assume that the contamination ruined the marketability
of the property (due to unwillingness of lenders to participate)
as he did in rendering his second opinion that the property was
worthless. Instead he simply adjusted the value to $1.6 million
in his appraisal. It is interesting to note that Middleton
completed his $1.8 million appraisal prior to being informed
that Moore Drums contaminated its own property Tr. p. 520.



knowledge must be an expert. It is uncontroverted that
Middleton is an expert in real estate appraisal, and it is
equally uncontroverted that he is not an expert in banking
practices. Tr. p. 524, lines 18-22 and p. 550, line 14 - p.
551, line 1.

Whether Middleton has any special expertise in appraising
contaminated property is a moot issue because he did not
appraise the property in its contaminated condition. If he had
done so using his usual methodology, the court would have
accepted his opinion into evidence and allowed the jury to
evaluate his expertise of contaminated properties and decide how
much weight to give it.

The second major requirement of Rule 702 is that the expert
must testify to scientific, or technical, or other specialized
knowledge that will assist the trier of fact. This is the
requirement that the Supreme Court evaluated in the now famous
Daubert case. Daubert teaches that the language of Rule 702
requires that an expert testify as to his scientific or
technical knowledge, which means that his opinion must be based
on the methods and procedures of his science or profession
rather than on subjective belief or unsupported speculation.
The record is clear that Middleton totally abandoned the methods
of the appraising profession in reaching his second opinion,
i.e., that the property is worthless. Consequently, that part
of his testimony is not reliable.



22

Plaintiff's approach to damages includes the contention that Middleton established the value of the property as $1.6 million uncontaminated, and that plaintiff's hydro-geologist established that it would cost $3.3 million to remediate the damage, therefore, the property is _ipso_ _facto_ worthless.

In addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact. This is often analyzed and spoken of as the "fit" requirement. _Daubert_, 509 U.S. at 592. Admissibility depends in part on the connection between the technical research or test to be presented, and the particular disputed factual issues in the case. Even if an expert's proposed testimony constitutes scientific or technical knowledge, it will be excluded if it is not scientific or technical knowledge for the purpose of the case. Middleton's testimony about the value of this property in its contaminated state does not fit.

When defendant moved to strike Middleton's testimony at trial, plaintiff's counsel put forth the argument that Middleton relied on "simple common sense, to say that if there is a $3 million price tag hanging out there for a clean-up, who's going to pay $1.6 million for that kind of liability. The answer is no. It doesn't take a rocket scientist to figure that out. I think Mr. Middleton expressed himself very well on that." Tr. p. 618, lines 1-7. Indeed, if it is common sense, then expert testimony is not required and is not helpful or needed under the rule. This court is not concerned with what Middleton said, but



23

the lack of a basis for his saying it.    Fed. R. Evid. 703
permits the admission of expert testimony even though the expert
has relied on evidence that is inadmissible, but the opinion is
admissible only if the expert has relied on information of a
kind reasonably relied on by experts in the field.    This court
is confident that neither Middleton nor any other MAI appraiser
has ever given an appraisal to a client and charged a fee when
it was based solely on telephone conversations with bankers.

> As we have emphasized in cases involving scientific
> testimony - and the principle applies to the social
> sciences with the same force that it does to the
> natural sciences - a scientist, however reputable, is
> not permitted to offer evidence that he has not
> generated by the methods he would use in his normal
> academic or professional work, which is to say in work
> undertaken without reference to or expectation of
> possible use in litigation.

Kahn v. State Oil Co., 93 F.3d 1358, 1365 (7th Cir. 1996),
judgment vacated on other grounds, 118 S. Ct. 139 (1997).    The
Supreme Court in Daubert told judges to distinguish between real
and courtroom science.    The object was to make sure that when
scientists or experts testify in court they adhere to the same
standards of intellectual rigor that are demanded in their
professional work.     If they do not, their evidence is
inadmissible no matter how imposing their credentials.    An
expert who supplies nothing but a bottom line supplies nothing
of value to the judicial process.    Rosen v. Ciba-Geigy Corp., 78



24

F.3d 316, at 318-319 (7th Cir.), cert. denied, 117 S. Ct. 73 (1996).[10]

The court finds as a matter of law that Middleton's testimony is not reliable and is based on speculation and does not provide a reasonable basis to support a jury verdict.

The court has also considered whether the verdict could be sustained based upon the effect on the value of the property in light of the projected cost and duration of the cleanup. However, there was insufficient testimony to establish that the remediation would materially interfere with the use of the plaintiff's property. South Carolina Code §§ 44-56-30 and 44-56-60 require DHEC to issue regulations governing the issuance of permits. These regulations include remediation requirements as a condition to a permit being issued. In the present case, DHEC has issued such a permit under which Lockheed operates. Moreover, DHEC requires evidence of financial assurance satisfactory to the department to ensure adequate remediation of any contamination, and DHEC is responsible for monitoring the actions necessary to satisfy contamination concerns.

Thus, the court finds that the verdict in favor of Moore Drums cannot be allowed to stand. The damage award to plaintiff could constitute a windfall. There are no claims under the Comprehensive Environmental Response, Contamination, and

---



[10]The court need not examine the factors set out by the Daubert court as "general observations," Daubert, 509 U.S. at 593, because the methodology of the members of the appraisal institute is unquestionably sound. It simply was not followed in this case.

Liability Act ("CERCLA") in this suit because the contamination at issue will be remediated by Lockheed in accordance with DHEC's standards and to the department's satisfaction. The record is void of any legally cognizable measure of damages to Moore Drums, and the verdict cannot be sustained based upon the cost of remediation to be paid by Lockheed.[11]  Plaintiff's theory of damages considered in conjunction with the remediation of the property to be undertaken by Lockheed constitutes a double recovery because the land will no longer be worthless once the remediation is completed.  This double recovery is inconsistent with South Carolina law.  See Braswell Shipyards, Inc. v. Beazer East, Inc., 2 F.3d 1331, 1338-39 (4th Cir. 1993)(citation omitted).[12]  Moore Drums cannot be allowed to receive a damage award based on the property's present value being zero and also be allowed to operate its business on the property and then retain the property in its uncontaminated state after remediation is completed by Lockheed.  See Gopher Oil Co., Inc.

---

[11]In memoranda submitted to the court subsequent to the trial, Moore Drums relies, inter alia, on a recent unpublished Fourth Circuit opinion, Castles Auto and Truck Serv., Inc. v. Exxon Corp., 125 F.3d 847 (4th Cir. 1997) (unpublished). Moore Drums asserts that the court's holding in Castles that evidence of remediation costs establishes a sufficient basis for the jury's award of an amount equal to those projected costs is directly applicable to the present case. In Castles, however, there was no requirement of the contaminating party to remediate in accordance with a permit issued by a regulatory authority like DHEC, as is the situation in present case.



[12]In Braswell, the Fourth Circuit held that the district court should retain jurisdiction over state common law claims until liability for the clean-up of the subject property under CERCLA was resolved in order to prevent a double recovery by the plaintiff.

26

v. Union Oil Co. of California, 955 F.2d 519, 528-29 (8th Cir. 1992).

### IV. CONCLUSION

Accordingly, the court finds that there was ample evidence for a reasonable jury to find for plaintiff as to each of its three (3) causes of action, and there was ample evidence from which a reasonable jury could have awarded punitive damages. The court further finds, however, that there was no legally sufficient evidentiary basis for a reasonable jury to have been able to properly assess actual damages.

It is therefore,

**ORDERED,** for the foregoing reasons, that Defendant's Motion for a Judgment as a Matter of Law is **GRANTED** to the extent that plaintiff failed to provide a sufficient basis for assessment of actual damages; and it is

**ORDERED** that because it would be undesirable and unworkable for the court to retain jurisdiction for the amount of time necessary to complete the clean-up, the court will withhold entry of final judgment pending employment by the court of an expert who will be charged with appraising the property to determine the fair market value of the property as contaminated by the defendant insofar as that is possible, and/or diminution in fair market value of the property after clean-up pursuant to the DHEC permits. Once that is accomplished, the court will consider Middleton's appraisal of the property in its pristine



27

condition (as both parties agree with that appraisal figure), and the appraisal provided by the court's expert to determine the amount of damages for diminution of value to the real estate. The court will attempt to insure that the plaintiff gets a full measure of damages without the danger of a double recovery. The court will leave undisturbed the jury's award of punitive damages, but will review the amount of punitive damages after the amount of compensatory damages is decided to determine if any adjustment in punitive damages is warranted, and it is

**ORDERED** that any other pending motions are **MOOT**.

**AND IT IS SO ORDERED.**

**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina.**
**June 18th, 1998**

28